Judge Blaine and I thank you for joining us again. We appreciate your help and we're delighted to see you. This is the time and place for a comeback to special sitting in Gomez-R. v. Lynch. And with that, counsel, you may begin. Good afternoon, Your Honors. May it please the Court, I'm Ginny Lopez as appointment counsel for the petitioner, Mr. Gomez. I'd like to reserve three minutes of time for rebuttal. The evidence in this case compels the conclusion that Mr. Gomez is more likely than not to be tortured in Mexico if he's forced to return, which requires relief under the Convention Against Torture. First, as this Court recognized in its prior opinion, there's no dispute that Mr. Gomez is a victim of past torture. He was kidnapped and he was taken to a compound run by a cartel where he was tortured himself and he witnessed others being tortured and killed. While he was at the compound, he saw police officers in uniform who were acquiescing in his torture. Second, Mr. Gomez provided credible testimony, but the cartel has personally targeted him and the other individuals who escaped the compound with him. The two other individuals were murdered, and he himself has been the target of a drive-by shooting. And there were a series of other incidents in which unknown people have monitored his whereabouts and have threatened people for information about him. We were reviewing the analysis of the BIA through very deferential eyes, as you know, and it was as if the BIA did put some degree of specificity and dress some of the pieces of evidence that this panel previously cited. What's the deficiency in the BIA's analysis? Is it the failures you mentioned, which discuss certain pieces of evidence? We believe it's a failure to consider the evidence as a whole. The BIA, again, relied on certain factors that it had deemed significant in the first round, for example, the lack of information about Santiago's whereabouts, and it really did not discuss the more recent evidence showing that the cartel has continued to target him and the other individuals who escaped. But whichever conclusion the BIA would have come to, they would have had to emphasize some evidence in front of others, where there was conflicting evidence, and the IJS fact finder makes a judgment about what actually occurred. And then on review, the BIA has to say, well, given those facts, here's how we analyze them. So if they'd come out your way, they would have left out facts, too. I guess I'm not sure why, if they were aware that we would find a requirement that every fact be discussed exclusively. Well, the regulations under Implementing the Convention Against Torture do say how evidence relevant to this claim must be considered. Considered, but not described. I mean, this is the second time the BIA had it, and we pointed them to a lot of things for them to look at, all of which they addressed in addition to addressing other things. Yes, Your Honor, but the evidence, we would submit that the way that the IJ and the BIA addressed the evidence was not consistent with what this court had set forth. So the court held not only was Mr. Gomez a victim of past torture, but that he had also submitted substantial evidence that conditions had not changed for him. And that, under this court's decision in Nauru, makes it presumptively likely that he's going to be tortured again on remand. So, for example, this court believed it corroborated his claim that his mother and his grandfather had actively been hiding under assumed names for decades. And instead, what the IJ did on remand was they diametrized President's first opinion, and that was evidence undermining his fear to feature torture because he could safely relocate within Mexico. So we don't believe the IJ used evidence in a manner that was consistent with this court's decision, and that's simply not consistent with the case law in the Convention Against Torture. How is it not consistent with the case law? If we grant you all of that, the history here, his sincere belief that he's going to be tortured, found and tortured, granting you all of that, granting you the evidence of public law enforcement involvement, doesn't the ultimate question simply come down to, is it more likely than not that he's going to be found and tortured if returned? And if that is a fair bottom line question, how do we conclude that the evidence before us compels a different result? This is reasonable. People could surely disagree on this point, right? Your Honor, all of the evidence in this case, the record consisted of Mr. Gomez's credible testimony, which is this court's act must be taken as true, which is unrebutted. The only evidence that the government submitted in this case 100% in his favor, credible. He sincerely believes he's a jeopardy if returned to Mexico. That doesn't mean he is. Right, Your Honor, and we're not asking the court to rely on his belief, his subjective belief. We think there are factual, there's a factual basis for his belief that this court must credit because his testimony was ... Well, but the problem is that when you separate out what are the facts on which he relied to get that belief, some of them are stale. He hasn't seen the person who was involved in his torture for over 30 years. He doesn't even know where he is in the case. He's probably in the United States, which would seem to counter that by going back to Mexico, the same person would find him and target him. So not every fact supports his belief. And, you know, that's one of the biggest things that the agency relied on. And, you know, it sounds rational to all to do so. So the BIA and IJ have always focused on that narrow question of Santiago's whereabouts, but he was always very clear in his documents and his testimony that he hears a much larger group. But that's where the specificity is lacking, and that's, I think, what Judge Durian is getting at, which is, yes, he does fear them. He's totally sincere about them. But where are the underlying factors that make that specific fear that someone else is going to use him now a compelled finding? Well, even at the time he fled in 1979, it was clear that the cartel had a nationwide reach. He knew that from Estella. Yet over a decade later, he learned from Estella that the cartel had murdered two of the other individuals who escaped, which seems to confirm that the cartel is seeking retribution against people like him. But it is also true that a lot of time has passed and that the Mexican government is taking greater steps. At least it was permissible for the agency to find that the government is taking much greater steps to control this kind of violence. Two responses to that, Your Honor. The most recent evidence on the record actually occurred in 2006, which was only two years before he was incarcerated, and it was only five years before his immigration hearing. And that's the incident where, you know, using his first name, his full name for the first time, he rented a storage unit, and then the cartel or people affiliated with the cartel were able to locate him and to threaten the storage facility employee for information about his whereabouts. I thought that was an unknown person, so I'm misremembering that. It's unknown persons, but it's, again, as this Court said in Rogerville, you can look to the pattern of conduct when he has put forth an explanation that's plausible. Is that to say, if he doesn't know who they are, then why are we compelled to find that they're connected to the people in Mexico who would torture him rather than to the criminal convenience that he may have here in the United States or other people who don't like him for personal reasons? Because, under his testimony, it was credible and it was unrebutted. If the government had evidence about criminal convenience within the United States, the government could have flooded that evidence. But what's credible is that he thought that they were connected, not that there are any facts that show that they're connected. That's my problem with your theory, because, you know, if someone credibly testifies, for example, that someone says, you know, I'm from the cartel and we are out to get you, that's one kind of evidence, even if you don't know the person's name. But another is, you're the subject of criminal activity or the object of criminal activity, and you don't have any idea who it is. Your belief may be sincere. Why are you compelled to credit the belief? I think this Court's decision in Roger Gall v. Holder is instructive here. In that case, the Court was very clear it was unknown persons, unidentified perpetrators. He was shot at his car, had sent a threatening note, had inquired about his whereabouts. And this Court said the PIA's decision that there was, quote, no evidence that that could be attributed to the cartel was erroneous. It was more than mere speculation. The PIA didn't say there was no evidence. It said that he had carried his burden, which is shown more likely than not, which is different. They didn't say that he didn't present any evidence. So they just looked at all the evidence and came to a certain conclusion, which is a little bit different, I think. Okay. Without really considering much of the evidence that we're discussing here, Your Honor, so we think if the Board had, the Board repeatedly said he had no contact with the people he feared since the early 1990s, again, that was a focus on Santiago, if the Court had accredited, we think that the factual contentions that he made, which are that these incidents occurred, and that he believes they are attributable to the cartel, and that the incidents in the early 90s are, in fact, attributed to the cartel by Estella, we believe that was a sufficient pattern of conduct that showed he had, in fact, had conduct with the cartel, which undermines the key basis of the BIA's decision here. The pattern of conduct is what's instructive. We also have significant corroborating evidence. We have his testimony about the nature of the cartels in this case, which is that they operate exactly in this way, by targeting people who have betrayed them or have resisted them. There's evidence of that in the country reports, where cartels routinely target informants or mayors or other people who resist them, and that he is, in fact, perceived by Santiago's cartel as somebody who falls within that category, because he was able to escape, and he was able to take the sister of the leader of the cartel with him. So that's, as this Court pointed out, that's other significant evidence that corroborates his claim, and it's evidence that other circuits have relied upon. There's a case in the Seventh Circuit in which an expert testified about the long memories of cartels and the fact that they continue to pursue people even years later. We also have, you know, the country conditions evidence in the record, which discusses cartel violence generally, and that that remains a serious problem, and that kidnapping seems like the type that led to his torture are, in fact, increasing in prevalence. And finally, we have evidence of the corruption problem in Mexico. So there should be no dispute on this record that if he's tortured, there will, in fact, be official acquiescence. So from our position, there's no contrary evidence in this record that undermines his fear of future torture. All of the evidence seems to point in one direction. The only contrary, you know, quote, evidence is the passage of time, but as this Court said in Haley and in other cases, where there's evidence of continued harassment, which we believe there is here, given his credible testimony, the passage of time is not a sufficient basis on which to rely. Did you wish to say something about time? Yes, I'd like to see the rest of the screen. I don't know if you may do that, Ms. Lopez. May it please the Court, my name is Kate Balaban. Good afternoon. I'm representing the government today, and I want to make sure, given your familiarity with the case, that I just cover three points, three significant points. One is the burden of proof. One is the distinction between credible testimony and the weight that that testimony is assigned. And then I want to make sure at the end to address the finding by the agency regarding the assumed, the grandparents living under assumed names in a remote village. So the first point I want to make is that the shift, the burden of proof is on the petitioner. And this is true regardless of the fact that there was a finding of past torture. And this is in contrast to the asylum withholding context, where the burden shifts. And that's significant here because all of the cases, Cole, Hale, Adu, Madrigal, that involved finding of past torture, they all had some extra factors that convinced the agency that it was indeed likely that there would be torture in the future. The aliens in those cases. May I interrupt it just a second? Yes, of course. In our order, we said substantial evidence does not support this determination. The petitioner failed to establish culpability for deferral. How has that evidence changed since then? So I can address that, Your Honor. The fact is that the evidence hasn't changed, but the agency's treatment of the evidence has changed radically. I'll be the first to say that there was short shrift given by the board in the first go-around to the discussion of the evidence. But then having seen the court's concerns, I think the IJ responded to each and every point in specificity. And the board did. We asked the board to give reasoned consideration. Why is it that you moved to remand it to the IJ? Well, because the facts needed to be. The IJ is the finder of fact, and the board. But we had the facts. We had the facts. Well, they were actually commented on our assessment of the evidence. We outlined the four points that we thought potentially decisive evidence existed. And we asked for reasoned consideration. Why do we need to do any fact-finding? And indeed, you didn't do any fact-finding. Excuse me, Your Honor, but I think the IJ did look at new country condition evidence. So that's important. And this is hardly a pivotal point in this case. But other than that, you're for sure, because there is no additional evidence. It's the IJ in the first instance who weighs the evidence, who decides what evidence is, whether or not the burden of proof has been met. And the IJ needed to do that in this case. And then the board looked at that opinion in all of its detail and agreed. So I think that the agency did the job on remand that was suggested by this court. And I think that the issue here is the court said that substantial evidence may have supported those inferences that were drawn. But the fact of the matter is it's for the finder of fact to weigh the evidence and determine whether or not the burden of proof has been met. In this instance, the agency, both the IJ and the board, thought that the burden of proof had not been met. And I think that this goes to the critical distinction between credibility and weight. The petitioner testified as to the things that happened to him. And the IJ said that the petitioner was credible. That means that he didn't think the petitioner was lying. That doesn't mean that all of the subsequent inferences that were drawn by the petitioner as to the facts that happened to him were correct or that were worthy of weight. And I think that's the rub here. And if this court were to find that just because testimony is generally credible, that means that all of the inferences. I think Counsel's argument is a little more grounded than that. Because I understood her argument to be not only was his fear credible, not only was his testimony credible about what had happened in the past, but the conclusion that he drew that his fear itself was supported by surrounding facts, such as the entry condition of the reports. And so I think it's a little more subtle than just saying, well, his belief is sincere, so you have to go with what he believed, whether it's reasonable or not. And so I think she's sort of making a secondary argument, as I understood it, as to why we would have to correct a belief. I think that a few of the case laws instructive here. NURU, the important part of that is the burden was on, the burden of proof as in this case was on the petitioner. And the petitioner pointed to specific evidence in the country reports that aliens in his classification, that is army deserters, were targeted. And that the army continued to go after them for years later. And there was nothing that the petitioner here could point to of that type. So I think that that's relevant. And then the other point I'll make is the Salazar Pulitzer, which is the case cited by the petitioner, saying that the court rejected speculation that the gang could no longer be interested in the alien years after the future. In that case, the burden, that was a withholding asylum case. So the burden here is strict. In that case, the burden was on the government. So any uncertainty would be down to the benefit of the petitioner in such a case, whereas here, as I understand your argument, any uncertainty about whether something is proved, the government gets the benefit of the doubt, essentially. I think there's two principles that operate here in tandem. One is the difference between credible and weighted evidence, how much weight the agency chooses to attach to a certain piece of evidence. And that goes to this objectively credible fear, as in the well-founded fear line of cases in an asylum withholding context. There's a third point, I think, that hasn't been discussed much by either of you, and is the standard of warlike with the dominant. I think everyone would, I shouldn't say everyone, but it appears to me that there's at least some possibility of torture. The question really isn't some possibility. It has to be more likely than not. I think, and the agency made the point that that has to, that standard applies to each piece of evidence that then need to be linked together to show that there is a likelihood of future torture. So I think that is significant also. What were you wanting to say about the grandparents you had seen? I'm sorry. In your, I'm sorry, it's quite an echoing courtroom. In your roadmap at the beginning, you mentioned the grandparents. Yes, I want to make sure to deal with that. I think that the agency relied on this finding that, for the conclusion that relocation is feasible. And to the extent that that's error, I'm not saying it is, but to the extent that it is, I think the most reasonable assumption is that the fact that they lived under assumed names shows that he can't relocate safely. That finding was unnecessary because that's a relocation finding. You have to show a likelihood of future torture. If you fail to show that, then the relocation finding is unnecessary. To the extent that that finding bears on the likelihood of future torture itself, which I could see it being turned around, as Kishner did and is briefed, to say that given the fact that they lived under assumed names, that that tends to suggest that a person afraid for their safety. Absolutely. I understand that. That's why I wanted to make sure to address this finding. I think that that, again, goes to the burden of proof, the weight of the evidence. And if that testimony had been buttressed by other facts, as in when did they change their names? And why did they change their names? Did they do so specifically because someone had come looking for a petitioner, or did they do so for some other reason? We simply don't know. That's not in the record. And what about other family members? Again, all of this is not in the record. So, to the extent that that piece of evidence was going to be used affirmatively to show a greater likelihood of torture in the future, I think that the agency was within its bounds to decide that it simply wasn't. Tenured into it. Exactly. Exactly. Exactly. I think that's it. Did you have any questions? Judge Geary, do you have further questions? No, I have no further questions. Thank you. Ms. Lopez, do you have some rebuttal time remaining? Thank you, Your Honors. On the last point about relocation, I would like to point out, and there's no further facts are necessary to be as clear from the record, that Petition 1047 and the Kennedy 850, he clearly explained that he had made his family afraid by his association with the cartel. That is, in fact, why they assumed their names. And the relocation point, we think, is an important one. Not only because this Court recognized it the first time as evidence supporting his claim, but also because, as I believe the government was alluding to, relocation does not mean living in hiding. So, it would be improper to order him removed on the assumption that he could be located when what that really means is that he would have to assume a new identity. I'd like to address Judge Geary's question about whether the Board gave reason and consideration to the evidence that this Court identified. And, really, it seems clear to me that the Board did not. So, for example, his credible testimony about 10% of officials being corrupt, the Court said that's not necessarily accurate in light of the country conditions evidence. But that country conditions evidence, if anything, supported the conclusion that more officials are corrupt than he had estimated. So, similarly, with respect to the testimony about the cartel's long memories, rather than understand how that bore on the likelihood of future torture, the IJ mentioned that in the official acquiescence question very briefly, without giving into weight. And the same is true for its consideration of the country reports, which we believe flatly misstated the record when it said that country conditions had improved. We think, in fact, they've significantly worsened in all of the respects that are relevant to his claim. On the burden of proof, we recognize that the petitioner bears the burden of proof for these proceedings. But the evidence here is unrebutted. That's a crucial point. The government did not submit anything other than corroborating country conditions evidence. And he, we believe, met his burden given that evidence. I'd like to turn very briefly to the remedy. We're asking this Court to direct relief for Mr. Gomez and instruct the BIA to grant him relief under the Convention Against Torture. We think that's consistent with this Court's case law. And I'm in Donna Hernandez, and Wynn, and Haley, and Edu, all cases in which the BIA fully considered the merits of the claim, but had simply reached an incorrect and unsupported conclusion. There's no reason for a revamp here. The BIA found two opportunities to consider all of the evidence in this case, and we believe its decision was unsupported by substantial evidence. The Court has no further questions. We ask the judge, Gary, do you have any further questions? No, thank you. Thank you. We ask the Court to reverse the Board and grant Mr. Gomez relief. Thank you, counsel. The case just started. It is submitted, and I would like to thank both counsel for excellent and helpful presentations. And with that, we stand adjourned for this session.
judges: Graber, Nguyen, Dearie